ORAL ARGUMENT NOT YET SCHEDULED
No. 23-1119

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

HOOSIER ENVIRONMENTAL COUNCIL, CALIFORNIA COMMUNITIES
AGAINST TOXICS, and SIERRA CLUB
*Petitioners*,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY,
and MICHAEL S. REGAN, Administrator,
United States Environmental Protection Agency,
*Respondents*.

PETITION FOR REVIEW OF FINAL ADMINISTRATIVE ACTION OF THE
UNITED STATES ENVIRONMENTAL PROTECTION AGENCY

## PROOF OPENING BRIEF OF HOOSIER ENVIRONMENTAL COUNCIL,
## CALIFORNIA COMMUNITIES AGAINST TOXICS, AND SIERRA CLUB

Tosh Sagar
Deena Tumeh
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC 20001
(202) 793-2075
(202) 793-6482
tsagar@earthjustice.org
dtumeh@earthjustice.org

*Counsel for Hoosier Environmental*
*Council, California Communities*

**DATED: August 31, 2023**

*Against Toxics, and Sierra Club*

**CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES**

Pursuant to D.C. Circuit Rule 28(a)(1), Petitioners Hoosier Environmental Council, California Communities Against Toxics, and Sierra Club ("Petitioners") state as follows:

**(A)    Parties and *Amici***

      **(i)    Parties, Intervenors, and *Amici* Who Appeared in the District Court**

This case is a petition for review of final agency action, not an appeal from the ruling of a district court.

      **(ii)    Parties to This Case**

Petitioners:

Petitioners in this case are Hoosier Environmental Council, California Communities Against Toxics, and Sierra Club.

Respondents:

Respondents in the above-captioned case are the United States Environmental Protection Agency ("EPA") and Michael S. Regan, in his official capacity as Administrator of the EPA.

Intervenors:

Battery Council International has been granted leave to intervene in support of Respondents.

**(iii)   *Amici* in This Case**

None. The Motion for Leave to Appear as Amicus Curiae of Clarios, LLC, is pending. DN #2009058.

**(iv)   Circuit Rule 26.1 Disclosures**

See Petitioners' disclosure form filed with the Petition for Review.

**(B)   Rulings Under Review**

Petitioners seek review of the final agency action taken by EPA titled "New Source Performance Standards Review for Lead Acid Battery Manufacturing Plants and National Emission Standards for Hazardous Air Pollutants for Lead Acid Battery Manufacturing Area Sources Technology Review," 88 Fed. Reg. 11,556 (Feb. 23, 2023).

**(C)   Related Cases**

None.

## RULE 26.1 DISCLOSURE STATEMENT

Pursuant to Federal Rules of Appellate Procedure Rule 26.1 and D.C. Circuit Rule 26.1, Petitioners hereby declare as follows:

1.       Petitioner Hoosier Environmental Council is a nongovernmental corporation organized under the laws of the State of Indiana. Hoosier Environmental Council does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in Hoosier Environmental Council. Hoosier Environmental Council engages in education, advocacy, and litigation to tackle Indiana's environmental challenges and help make Indiana a healthier, better place to live and do business. Air quality is one of Hoosier Environmental Council's core programmatic areas, and the Council seeks to reduce its members' and others' exposure to unhealthy air pollution.

2.       California Communities Against Toxics is a non-profit organization that is a project of a non-profit corporation (Del Amo Action Committee) that is organized and existing under the laws of the State of California. California Communities Against Toxics does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in the organization. The organization is an environmental justice network that aims to reduce exposure to pollution, to expand knowledge about the effects of toxic

chemicals on human health and the environment, and to protect the most vulnerable people from harm.

3.     Petitioner Sierra Club is a nongovernmental corporation organized under the laws of the State of California. Sierra Club does not have any parent corporations, and no publicly held corporation has a ten percent or greater ownership interest in Sierra Club. Sierra Club's mission is to explore, enjoy, and protect the wild places of the Earth; to practice and promote the responsible use of the Earth's resources and ecosystems; to educate and enlist humanity to protect and restore the quality of the natural and human environment; and to use all lawful means to carry out these objectives.

DATED:      August 31, 2023

/s/ Tosh Sagar
Tosh Sagar
Deena Tumeh
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC 20001
(202) 793-2075
(202) 793-6482
tsagar@earthjustice.org
dtumeh@earthjustice.org

*Counsel for Hoosier Environmental Council, California Communities Against Toxics, and Sierra Club*

## **TABLE OF CONTENTS**

CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES ........... iii

RULE 26.1 DISCLOSURE STATEMENT ............................................ v

TABLE OF AUTHORITIES ............................................................ ix

GLOSSARY OF ACRONYMS AND ABBREVIATIONS ................................. xvi

INTRODUCTION ...................................................................... 1

JURISDICTIONAL STATEMENT ....................................................... 5

STATUTES AND REGULATIONS ..................................................... 5

ISSUE STATEMENT .................................................................. 5

STATEMENT OF THE CASE .......................................................... 5

    I. Factual Background ........................................................ 5

        A.  Lead is an extremely toxic air pollutant, and there is no safe level of exposure. ........................................................ 5

        B.  Lead acid battery makers emit lead air pollution. ........................... 7

    II.  LEGAL BACKGROUND ..................................................... 8

    III.  PROCEDURAL BACKGROUND ............................................ 12

        A. EPA set initial standards for lead acid battery makers in 2007. .... 12

        B. There have been revolutionary developments in fenceline monitoring since the 2007 Rule. ........................................ 13

        C. EPA refused to take the developments in fenceline monitoring into account in the challenged rulemaking. ........................... 15

            1. In the Proposed Rule, EPA ignored developments in fenceline monitoring in other industries. ................................. 15

            2. Petitioners' Comments pointed out developments in fenceline monitoring, including to control lead emissions. ...... 16

            3. In the Final Rule, EPA doubled down on its unlawful approach, concluding fenceline monitoring is not a development. ................................................. 17

SUMMARY OF ARGUMENT .......................................................... 18

STANDARD OF REVIEW ............................................................. 21

STANDING ....................................................................................................23

ARGUMENT ..................................................................................................26

    I. EPA's interpretation is contrary to the unambiguous mandate in Section 7412(d)(6) that EPA take into account all relevant developments. .................26

    II. Even if Section 7412(d)(6) were ambiguous, EPA's interpretation is unreasonable because it is unexplained. ...........................................................34

    III. EPA's action is arbitrary and capricious because it is contrary to EPA's existing regulatory framework for identifying and analyzing developments..38

        A. EPA did not rationally apply its existing regulatory framework for identifying and analyzing relevant developments..............................38

            1. EPA's refusal to "identify" fenceline monitoring as a development is contrary to its existing regulatory framework and the record.......................................................................... 40

            2. EPA arbitrarily failed to follow its framework and "analyze" whether it was necessary to revise standards to require fenceline monitoring. ................................................... 41

        B. EPA's justifications for departing from its regulatory framework fail.........................................................................................................44

            1. EPA offered irrational and unsupported justifications for why it did not "identify" fenceline monitoring as a development in pollution control. ........................................... 44

            2. EPA's response to Petitioners' Comments was irrational. .. 49

CONCLUSION ...............................................................................................50

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT................. 52

CERTIFICATE OF SERVICE ......................................................................... 53

# TABLE OF AUTHORITIES

<u>C</u><u>ASES</u>                                                      <u>P</u><u>AGE</u><u>(S)</u>

*Artists & Recording Companies, Inc. v. DENSO Int'l Am., Inc.*,
   947 F.3d 849 (D.C. Cir. 2020)..................................................................28

*Bluewater Network v. EPA*,
   370 F.3d 1 (D.C. Cir. 2004)........................................................... 22, 48

* *BP Energy Co. v. FERC*,
   828 F.3d 959 (D.C. Cir. 2016)............................................... 20, 22, 36

*Chemehuevi Tribe of Indians v. Fed. Power Comm'n*,
   489 F.2d 1207 (D.C. Cir. 1973)............................................................27

*Chevron, U.S.A., Inc. v. NRDC*,
   467 U.S. 837 (1984)......................................................................... 22, 26

*City of Waukesha v. EPA*,
   320 F.3d 228 (D.C. Cir. 2003)..............................................................25

*Clean Wisconsin v. EPA*,
   964 F.3d 1145 (D.C. Cir. 2020) ..........................................................24

*Ctr. For Biological Diversity v. Dep't of Interior*,
   563 F.3d 466 (D.C. Cir. 2009)..............................................................34

*EDF v. EPA*,
   922 F.3d 446 (D.C. Cir. 2019)..............................................................24

* *Encino Motorcars v. Navarro*,
   579 U.S. 211 (2016)..................................................... 21, 22, 36, 37

* *FCC v. Fox Television Stations, Inc.*,
   556 U.S. 502 (2009).............................................................. 21, 36, 39

ix

*Friends of Animals v. Jewell*,
    824 F.3d 1033 (D.C. Cir. 2016)..............................................................24

*Growth Energy v. EPA*,
    5 F.4th 1 (D.C. Cir. 2021)........................................................... 40, 41

*Humane Soc'y of United States v. Zinke*,
    865 F.3d 585 (D.C. Cir. 2017) ...................................... 38, 46, 49, 50

* *Kentucky Mun. Energy Agency v. FERC*,
    45 F.4th 162 (D.C. Cir. 2022) ...............................21, 38, 39, 40, 41-47

*Louisiana Env't Action Network v. EPA*,
    955 F.3d 1088 (D.C. Cir. 2020)................................................................8

*Miller v. Clinton*,
    687 F.3d 1332 (D.C. Cir. 2012)..............................................................35

*Nat'l Ass'n for Surface Finishing v. EPA*,
    795 F.3d 1 (D.C. Cir. 2015) ........................................... 1, 18, 27

*Nat'l Ass'n of Clean Air Agencies v. EPA*,
    489 F.3d 1221 (D.C. Cir. 2007).............................................................22

*Nat'l Lime Ass'n v. EPA*,
    233 F.3d 625 (D.C. Cir. 2000).........................................................9, 30

* *New York v. EPA*,
    413 F.3d 3 (D.C. Cir. 2005)........................................... 19, 20, 22, 27, 30, 32, 33

*NRDC v. Daley*,
    209 F.3d 747 (D.C. Cir. 2000) ........................................... 22, 34

*NRDC v. EPA*,
    529 F.3d 1077 (D.C. Cir. 2008) ........................................... 20, 32

*NRDC v. EPA*,
    643 F.3d 311 (D.C. Cir. 2011)..............................................................24

*NRDC v. EPA*,
    822 F.2d 104 (D.C. Cir. 1987)..............................................................23

*NRDC v. Reilly*,
    983 F.2d 259 (D.C. Cir. 1993) ..................................................... 20, 32

*People for the Ethical Treatment of Animals v. U.S. Department of Agriculture*,
    797 F.3d 1087 (D.C. Cir. 2015).........................................................25

*Perrin v. United States*,
    444 U.S. 37 (1979) ...........................................................................27

*Pub. Citizen v. Fed. Motor Carrier Safety Admin.*,
    374 F.3d 1209 (D.C. Cir. 2004).........................................................42

*Rapoport v. SEC*,
    682 F.3d 98, 106 (D.C. Cir. 2012)................................................ 45, 47

*Sierra Club v. EPA*,
    699 F.3d 530 (D.C. Cir. 2012)..........................................................25

*Sorenson Commc'ns Inc. v. FCC*,
    755 F.3d 702 (D.C. Cir. 2014)..........................................................48

*State of Ohio v. U.S. Dep't of the Interior*,
    880 F.2d 432 (D.C. Cir. 1989)..................................................... 20, 34

*United States. v. Braxtonbrown-Smith*,
    278 F.3d 1348 (D.C. Cir. 2002) .......................................................28

* *U.S. Telecom Ass'n v. FCC*,
    359 F.3d 554 (D.C. Cir. 2004)..................................................... 27, 34

*Univ. of Tex. Sw. Med. Ctr. v. Nassar*,
    570 U.S. 338 (2013) ................................................................... 23, 36

## S<small>TATUTES</small>

42 U.S.C. § 7401(b)(1)................................................................35

42 U.S.C. § 7412................................................................8

42 U.S.C. § 7412(a)(1)................................................................8

42 U.S.C. § 7412(a)(2)................................................................8

42 U.S.C. § 7412(b)................................................................8

42 U.S.C. § 7412(c)................................................................9

42 U.S.C. § 7412(c)(1)................................................................8

42 U.S.C. § 7412(c)(2)................................................................9

42 U.S.C. § 7412(d)(2)........................................................ 9, 30, 31, 32

42 U.S.C. § 7412(d)(3)........................................................ 9, 19, 24

42 U.S.C. § 7412(d)(3)(A)........................................................ 30, 31

42 U.S.C. § 7412(d)(3)(B)........................................................ 30, 31

42 U.S.C. § 7412(d)(5)................................................................9, 32

42 U.S.C. § 7412(d)(6).....................1, 2, 3, 9, 10, 14, 15, 17, 18, 19, 26, 27, 29-34

42 U.S.C. § 7412(f)(2) ................................................................ 9

42 U.S.C. § 7412(j)(2) ................................................................ 31

42 U.S.C. § 7412(i)(5)(D) ................................................................ 30, 31

42 U.S.C. § 7607(b)(1)................................................................5

42 U.S.C. § 7607(d)(3)............................................................24

42 U.S.C. § 7607(d)(1)(B) .......................................................22

42 U.S.C. § 7607(d)(9)(A) .......................................................22

## REGULATIONS

40 C.F.R. § 63.2 ......................................................................7

40 C.F.R. § 63.11211 .............................................................29

40 C.F.R. § 63.11423 .............................................................29

40 C.F.R. § 63.1209 ...............................................................29

40 C.F.R. § 63.1444 ...............................................................29

40 C.F.R. § 63.548 .................................................................29

40 C.F.R. § 63.7324 ...............................................................29

40 C.F.R. § 63.7821 ...............................................................29

40 C.F.R. § 63.8450 ...............................................................29

40 C.F.R. § 63.9622 ...............................................................29

40 C.F.R. Pt. 63, Subpt. UUU, Tbl. 4 .....................................29

40 C.F.R. Pt. 63, Subpt. SSSSS, Tbl. 8 .................................. 29

## FEDERAL REGISTER NOTICES

61 Fed. Reg. 17,358 (Apr. 19, 1996) .......................... 9, 31, 32

72 Fed. Reg. 16,636 (Apr. 4, 2007) ........................................13

72 Fed. Reg. 38,864 (July 16, 2007).............................................................. 13, 15, 41

75 Fed. Reg. 65,068 (Oct. 21, 2010)........................................................................10

75 Fed. Reg. 80,220 (Dec. 21, 2010).................................................................. 12, 37

78 Fed. Reg. 22,370 (Apr. 15, 2013) ...................................................................9, 32

78 Fed. Reg. 66,108 (Nov. 4, 2013)......................................................................4, 11

79 Fed. Reg. 36,880 (June 30, 2014) ................................................................. 14, 15

80 Fed. Reg. 75,178 (Dec. 1, 2015) ............................................... 14, 37, 40, 43, 50

83 Fed. Reg. 19,499 (May 3, 2018).........................................................................12

84 Fed. Reg. 56,288 (Oct. 21, 2019).......................................................................15

86 Fed. Reg. 3,079 (Jan. 14, 202)...........................................................................12

87 Fed. Reg. 1,616 (Jan. 11, 2022) .........................................................................12

87 Fed. Reg. 10,134 (Feb. 23, 2022) .......................................................................15

88 Fed. Reg. 11,556 (February 23, 2023)...5, 7, 10, 17, 18, 21, 24, 36,38-43, 46, 48

88 Fed. Reg. 49,402 (July 31, 2023)........................................................................50

**OTHER AUTHORITIES**

1990 U.S.C.C.A.N. 3385, 3518 ................................................................................32

Cynthia Giles, *Next Generation Compliance* (2013)....................................... 13, 41

CDC, *Pregnant Women*, https://www.cdc.gov/nceh/lead/prevention/pregnant.htm
    (last updated July 21, 2022) ....................................................................................6

Development, Longman Basic Dictionary of American English (Adam Gadsby et al. ed., 1st ed. 1999) ........................................................................27

EPA, Compendium of Next Generation Compliance Examples in Clean Air Act Programs (2016).....................................................................................14

EPA, Technology Review and NSPS Review for Lead Acid Battery Manufacturing (2022) ("Technology Review Memorandum")..........................16

## GLOSSARY OF ACRONYMS AND ABBREVIATIONS

Pursuant to DC Circuit Rule 28(a)(3), the following is a glossary of

acronyms and abbreviations used in this brief:

| | |
|---|---|
| EPA | Respondents U.S. Environmental Protection Agency and Administrator Michael S. Regan |
| JA | Joint Appendix |
| GACT | Generally Available Control Technology or Management Practices. |
| MACT | Maximum Achievable Control Technology |
| NESHAP | National Emission Standards for Hazardous Air Pollutants |

**INTRODUCTION**

This case challenges an interpretation of the Clean Air Act ("Act") by the Environmental Protection Agency ("EPA" or "the Agency"). EPA relied on this interpretation to justify its refusal to establish a fenceline monitoring and corrective action standard for lead acid battery makers. Under the provision at issue, EPA "shall review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every 8 years." 42 U.S.C. § 7412(d)(6). This provision requires EPA to conduct a "technology review" to determine "whether standards [for an industry] should be tightened in view of developments in technologies and practices since the standard's promulgation or last revision." *Nat'l Ass'n for Surface Finishing v. EPA*, 795 F.3d 1, 5 (D.C. Cir. 2015).

In this rulemaking, EPA was presented with a straightforward question: is fenceline monitoring a "development[] in practices, processes, or control technologies" since EPA last set standards for lead acid battery makers in 2007. 42 U.S.C. § 7412(d)(6). If fenceline monitoring is such a development in pollution control, EPA was obligated to take it into account and decide whether to revise the 2007 standards to require fenceline monitoring.

The answer should have been an unequivocal yes. Since that 2007

rulemaking, EPA has declared a revolution in using monitors to control air pollution. EPA has acknowledged that placing air monitors at the fenceline of polluting facilities and requiring polluters to take corrective action when pollution gets too high is part of the next generation of pollution control techniques. And the record established that fenceline monitoring is being used to control lead emissions in industries similar to lead acid battery makers. Moreover, starting in 2015, EPA has: (1) recognized in Section 7412(d)(6) rulemakings for other industries that fenceline monitoring is a development in pollution control; and (2) established fenceline monitoring and corrective action standards for other industries regulated under Section 7412(d)(6).[1]

Yet, here, EPA answered no. To do so, EPA interpreted Section 7412(d)(6) as establishing a pre-requisite to identifying an advance in pollution control as a "development": some facilities in the industry undergoing review must already be using the pollution control. Applying that interpretation here, EPA concluded that lead acid battery makers are not using fenceline monitoring and, therefore, it is not

---

[1] If a fenceline monitoring and corrective action standard was mandated at lead acid battery makers, these factories would be required to set up air monitoring devices to measure lead levels at the perimeter of the facility—i.e., at the fenceline. EPA would set an action level—i.e., the allowable amount of lead in the air as measured by those monitors. If the measured level of lead exceeded the action level, the facility operator would be required to develop and implement a plan to reduce emissions until lead levels are below the corrective action.

a development in pollution control. Because EPA refused to identify fenceline monitoring as a development, it never accounted for the revolutionary advances in fenceline monitoring when deciding whether to revise the standards for lead acid battery makers. In other words, because lead acid battery makers are not currently using fenceline monitors, EPA refused to even consider whether it should require them to do so.

EPA's creation of that pre-requisite is an unlawful re-writing of Section 7412(d)(6). Congress understood that applicable, and therefore relevant, developments in pollution controls are routinely found in other industries. Accordingly, Section 7412(d)(6) requires EPA to consider developments in pollution control without any express limitation. Thus, by its plain terms, the Act requires EPA to consider developments in pollution control from other industries. Indeed, if Congress had intended to limit EPA to considering developments "in the [industry] category" being reviewed, it would have used that limiting phrase, just as it did multiple times in Section 7412. That Congressional choice must be given effect. Accordingly, EPA's interpretation violates Congress' unambiguous command that EPA identify all relevant advances in pollution control as developments.

EPA's interpretation is also unreasonable and arbitrary because EPA's new

interpretation conflicts with its existing regulatory framework, which EPA expressly committed to applying in this rulemaking. Fenceline monitoring plainly meets EPA's long-standing definition of developments, which includes "any work practice[]" or "any . . . equipment" that was not "identified or considered" in the prior rulemaking for the category. *E.g.*, 78 Fed. Reg. 66,108, 66,121 (Nov. 4, 2013), JA____. Fenceline monitoring is a development under that definition: fenceline monitoring is both a work practice and a type of equipment; and EPA did not identify or consider fenceline monitoring in the prior 2007 rulemaking for lead acid battery makers.

Despite committing to applying its long-standing definition, the Agency did not do so when it concluded that fenceline monitoring is not a development in pollution control. EPA never acknowledged it was departing from its existing regulatory framework or its past precedents and thus failed to offer any reasoned explanation for its new interpretation or its final decision. That failure to engage in reasoned decision-making renders its interpretation unreasonable and its action arbitrary and capricious.

Accordingly, EPA's determination that fenceline monitoring is not a development should be vacated and remanded to EPA so that it takes into account developments in fenceline monitoring in deciding whether to revise the standards

for lead acid battery makers.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 42 U.S.C. § 7607(b)(1) to review EPA's final agency action at 88 Fed. Reg. 11,556 (February 23, 2023) ("Final Rule"). Petitioners timely petitioned for review within the Act's 60-day window on April 24, 2023. 42 U.S.C. § 7607(b)(1).

## STATUTES AND REGULATIONS

Pertinent statutes and regulations appear in an addendum to this brief.

## ISSUE STATEMENT

1. Was EPA's decision not to adopt a fenceline monitoring and corrective action standard in the Rule unlawful and arbitrary?

## STATEMENT OF THE CASE

## I.   FACTUAL BACKGROUND

### A.   Lead is an extremely toxic air pollutant, and there is no safe level of exposure.

Lead is a highly toxic metal that seriously harms human health. Indeed, EPA acknowledges that "[t]he best available science [] shows there is <u>no safe level</u> of exposure to lead." EPA, Basic Information about Lead in Drinking Water (emphasis added), JA____; *see, also,* Comments of California Communities Against Toxics, et al., ("Petitioners' Comments") 5-6, JA____-__.

Lead damages the brain, causes heart diseases, and harms other vital organ systems, including the renal and reproductive systems. EPA, Basic Information about Lead in Drinking Water, JA____. Approximately 400,000 deaths are attributable to lead exposure annually in the United States. Petitioners' Comments at 6, JA____ (citing Lanphear B et al., *Low-level lead exposure and mortality in US adults: a population based cohort study*, 3 Lancet Public Health e177, e182 (2018)).

Lead is particularly harmful to fetuses and children. Lead exposure increases the risk of miscarriage or preterm delivery and harms the developing brain, kidneys, and nervous systems. CDC, *Pregnant Women*, https://www.cdc.gov/nceh/lead/prevention/pregnant.htm (last updated July 21, 2022). Childhood lead exposure causes permanent neurological damage, behavioral disorders, and cognitive impairments. Petitioners' Comments at 5, JA____.

People are exposed to lead emissions from industrial sources through multiple pathways, including inhalation. Petitioners' Comments at 8, JA____. Additionally, lead in the air eventually deposits onto the ground. Children can come into contact with lead-contaminated soil, or lead in the soil can contaminate the food chain. *Id.*

6

Because "there is no safe level of exposure to lead . . . any action to reduce exposures can have impacts on lives and livelihoods." EPA, Basic Information about Lead in Drinking Water, JA____; *see* Petitioners' Comments at 5, JA____.

**B.    Lead acid battery makers emit lead air pollution.**

Lead acid battery makers produce batteries for applications like traditional car starter batteries. Final Rule, 88 Fed. Reg. at 11,557, JA____.

The manufacturing process creates emissions of lead and other hazardous air pollutants, including fugitive lead emissions—i.e., emissions which do not pass through a smokestack or vent. *See, e.g.*, Final Rule, 88 Fed. Reg. at 11,566, JA____; *see* 40 C.F.R. § 63.2 (defining "fugitive emissions"). For example, lead acid battery making produces lead dust, which becomes airborne, is "deposited to outdoor surfaces at or near the facilities and [] may become airborne again via wind or surface disturbance activities, such as vehicle traffic." Final Rule, 88 Fed. Reg. at 11,566, JA____. Fugitive emissions constitute a significant amount of overall lead emissions from industry; EPA found that fugitives constitute over 70% of the total lead emissions at one of the larges emitters in the industry. EPA, Memorandum to Docket: Emissions and Ambient Monitoring Data Used for the Lead Acid Battery Manufacturing Rule Reviews 5 (Feb. 10, 2022) (quantifying emissions from Stryten, Iowa), JA____.

## II.    LEGAL BACKGROUND

In the 1990 Amendments to the Clean Air Act, Congress sought to address emissions of lead and other toxic air pollutants from industrial sources, establishing the "Hazardous air pollutants" provisions in Section 7412. 42 U.S.C. § 7412.

Congress established a list of "hazardous air pollutants," which included lead. *Id.* § 7412(b). Congress mandated that EPA identify every "category" of sources—i.e., every industry—that emits lead or any other hazardous air pollutant.[2] *Id.* § 7412(c)(1). Congress required EPA to establish distinct categories for large and small emitters within an industry—"major sources," which emit hazardous air pollutants above numerical thresholds, and "area sources," which emit below those thresholds.[3] *Id.*

EPA must set standards for each category and "each source category's emission standard [must] address every recognized hazardous pollutant that the source category is known to emit." *Louisiana Env't Action Network v. EPA*, 955

---

[2] While the statute requires that EPA identify "categories and subcategories of major sources and area sources," 42 U.S.C. § 7412(c)(1), subcategories are not relevant to the claims here.

[3] A "major source" "emits or has the potential to emit considering controls, in the aggregate, 10 tons per year or more of any hazardous air pollutant or 25 tons per year or more of any combination of hazardous air pollutants." 42 U.S.C. § 7412(a)(1). An "area source" emits below those thresholds. *Id.* § 7412(a)(2).

F.3d 1088, 1090 (D.C. Cir. 2020); *see* 42 U.S.C. § 7412(c)(2). Congress further

mandated that EPA establish and then review standards for each category on

precise timetables. 42 U.S.C. § 7412(c), (d)(6), (f)(2).

For each category, EPA begins by setting initial standards. For a category of

major sources, EPA must establish what are known as "maximum achievable

control technology" ("MACT") standards. *Nat'l Lime Ass'n v. EPA*, 233 F.3d 625,

629-630 (D.C. Cir. 2000), *as amended on denial of reh'g* (Feb. 14, 2001)

(describing standard setting for major sources under 42 U.S.C. § 7412(d)(2),

(d)(3)). For a category of area sources, EPA may impose MACT standards or,

instead, standards which "provide for the use of generally available control

technology or management practices" ("GACT") standards. *Id.* § 7412(d)(5).

When setting these initial standards for a category—whether a category of

area sources or major sources—EPA considers whether pollution controls in

"similar" or related industries could be used in the category for which it is setting

standards. NESHAP: Mineral Wool Production and Wool Fiberglass

Manufacturing, 78 Fed. Reg. 22,370, 22,376 (Apr. 15, 2013) (setting initial area

source standards) ("Wool Fiberglass Rule"), JA____; Revised Standards for

Hazardous Waste Combustors, 61 Fed. Reg. 17,358, 17,368 (Apr.19, 1996) (noting

that EPA considered "technologies currently in use within these industry sectors,

and also other more efficient and appropriate technologies"), JA____.

After EPA sets initial standards for a category, it must periodically review the sufficiency of the standards to keep them up to date. 42 U.S.C. § 7412(d)(6). For each category (whether an area source or major source), Congress required that EPA "review, and revise as necessary (taking into account developments in practices, processes, and control technologies), emission standards promulgated under this section no less often than every 8 years." *Id.*

EPA has established a two-step framework to guide its determination of whether to revise standards in a technology review. First, EPA "identifies developments in practices, processes, and control technologies" that have occurred since the standards were promulgated. *E.g.*, NESHAP: Group I Polymers and Resins, 75 Fed. Reg. 65,068, 65,083 (Oct. 21, 2010), JA____. Second, "[i]f a review of available information identifies such developments, then [EPA] conduct[s] an analysis of the technical feasibility of requiring the implementation of these [identified] developments, along with the impacts (costs, emission reductions, risk reductions, etc.)." *Id.*; *see* Final Rule, 88 Fed. Reg. at 11,559 (similar), JA____.

For roughly a decade and across dozens of rulemakings, EPA has applied a consistent and broad definition of "developments" under that framework. That

10

definition establishes fives types of relevant advances that EPA identifies as developments in a technology review:

- "<u>Any</u> add-on control technology or other equipment that was not identified and considered during development of the original GACT [or MACT] standards;"

- "<u>Any</u> improvements in add-on control technology or other equipment (that were identified and considered during development of the original [GACT or MACT] standards) that could result in additional emissions reduction;"

- "<u>Any</u> work practice or operational procedure that was not identified or considered during development of the original [GACT or MACT] standards;"

- "<u>Any</u> process change or pollution prevention alternative that could be broadly applied to the industry and that was not identified or considered during development of the original [GACT or MACT] standards; and"

- "<u>Any</u> significant changes in the cost (including cost effectiveness) of applying controls (including controls the EPA considered during the development of the original [GACT or MACT] standards)."[4]

---

[4] *E.g.*, NESHAP: Flexible Polyurethane Foam Production Technology Review, 78 Fed. Reg. 66,108, 66,121 (Nov. 4, 2013), JA____; NESHAP: Materials

In technology reviews, EPA routinely looks to other, often "similar" industries—outside the category being reviewed—to identify relevant developments in pollution control. *E.g.*, NESHAP: Refractory Products Manufacturing Technology Review, 86 Fed. Reg. 3,079, 3,085 (Jan. 14, 2021) (stating that to identify "developments," EPA reviewed standards for "other similar source categories"), JA____. In doing so, EPA assesses whether pollution controls implemented in those other industries "could be applied" to the category under review. *See id.*; NESHAP: Shipbuilding and Ship Repair and Wood Furniture Manufacturing Operations Technology Reviews, 75 Fed. Reg. 80,220, 80,234 (Dec. 21, 2010) ("Shipbuilding Rule") (considering if developments from other source categories "could possibly be applied to emission sources in the source categories under this current [technology] review"), JA____.

## III.    PROCEDURAL BACKGROUND

### A.    EPA set initial standards for lead acid battery makers in 2007.

After EPA identified Lead Acid Battery Manufacturing Area Sources as a category of area sources, EPA established initial GACT standards for the category

---

Manufacturing Facilities Technology Review, 83 Fed. Reg. 19,499, 19,504 (May 3, 2018) (same definition), JA____; NESHAP: Primary Copper Smelting and Primary Copper Smelting Area Source Technology Reviews, 87 Fed. Reg. 1,616, 1,623 (Jan. 11, 2022) (same definition), JA____.

in 2007. NESHAP: Lead Acid Battery Manufacturing, 72 Fed. Reg. 38,864 (July 16, 2007) ("2007 Rule"), JA____; NESHAP: Lead Acid Battery Manufacturing, 72 Fed. Reg. 16,636 (Apr. 4, 2007) (proposed rule), JA____; *see, generally*, 40 C.F.R. Part 63 Subpart PPPPPP. In the final rulemaking, EPA did not identify or consider a fenceline monitoring standard for lead acid battery makers. Indeed, there is no mention of "fenceline monitoring" in either the proposed or final rule.

## B. There have been revolutionary developments in fenceline monitoring since the 2007 Rule.

Following the 2007 Rule, EPA recognized that "[m]onitoring devices are becoming more accurate, more mobile, and cheaper," creating an ongoing "revolution" in the use of monitoring to reduce the emissions of toxic air pollutants. Cynthia Giles, *Next Generation Compliance* 24 (2013), JA____.[5] EPA further recognized that monitors often shows that companies "greatly underestimate their pollution, sometimes by an order of magnitude." *Id.* Thus, EPA recognized that having "[a]ctual measurements, as opposed to estimates, often show far higher emissions than [EPA], or the company, thought." *Id.*

EPA recognized that fenceline monitoring was a key part of this revolution. "Fenceline monitoring involves placing air sensors around the perimeter of a

---

[5] The author wrote the article in her capacity as the Assistant Administrator for EPA's Office of Enforcement and Compliance Assurance.

facility's property" and, thus, differs from "traditional monitoring," which measures specific "emissions points" in a facility, like a smokestack. EPA, Compendium of Next Generation Compliance Examples in Clean Air Act Programs 12 (2016) ("Next Generation Compliance Compendium"), JA____. "Fenceline monitoring assesses the actual downwind impact of <u>all</u> the emissions at a facility," capturing emissions from discrete emission points, like smokestacks, as well as "fugitive" emissions. *Id.*

Critically, EPA recognized that fenceline monitoring was a recent development in controlling toxic air pollution, stating "[a]lthough not new technology, its application in permitting or air rules is new." *Id.* Consequently, EPA included fenceline monitoring in its "Next Generation Compliance" initiative, EPA's "modern approach" to addressing pollution control. *Id.* at 1, JA____.

In 2015, EPA established a fenceline monitoring and corrective action standard for the Petroleum Refinery categories, the first-of-its-kind implemented under Section 7412(d)(6). NESHAP: Petroleum Refinery Sector Risk and Technology Review, 80 Fed. Reg. 75,178, 75,182 (Dec. 1, 2015) ("Petroleum Refinery Rule"), JA____. As EPA recognized in the rulemaking, fenceline monitoring would enable quicker and more effective reductions of fugitive emissions. NESHAP: Petroleum Refinery Sector Risk and Technology Review, 79

14

Fed. Reg. 36,880, 36,928 (June 30, 2014) ("Petroleum Refinery Proposal"),

JA____. In several subsequent technology reviews, EPA also identified fenceline

monitoring as a "development" in pollution control practices. *E.g.*, NESHAP:

Organic Liquids Distribution Technology Review, 84 Fed. Reg. 56,288, 56,313-17

(Oct. 21, 2019) (finding fenceline monitoring is "an advancement in monitoring

practice"), JA____-__.

### C. EPA refused to take the developments in fenceline monitoring into account in the challenged rulemaking.

Because EPA first set standards for Lead Acid Battery Manufacturing Area

Sources in 2007, the Agency was required to conduct a technology review under

Section 7412(d)(6) within 8 years—i.e., by July 2015. *See* 2007 Rule, 72 Fed. Reg.

38,864; 42 U.S.C. § 7412(d)(6).

### 1. In the Proposed Rule, EPA ignored developments in fenceline monitoring in other industries.

EPA conducted a technology review and proposed revised emission

standards for lead acid battery makers in 2022. NESHAP: Lead Acid Battery

Manufacturing Area Sources Technology Review, 87 Fed. Reg. 10,134 (Feb. 23,

2022) ("Proposed Rule"), JA____. The Proposed Rule reaffirmed EPA's long-

standing definition of "developments" under Section 7412(d)(6), which includes

"[a]ny equipment" or "[a]ny work practice" that was "not identified or considered

15

during development of the original GACT standards." *Id.* at 10,140, JA____.

Yet, EPA restricted its search to advances that had been adopted within the Lead Acid Battery Manufacturing Area Source category, stating that it sought "to determine whether there have been developments in practices, processes, or control technologies by lead acid battery manufacturing sources." Proposed Rule, 87 Fed. Reg. at 10,139 (emphasis added), JA____.

From this limited search, EPA identified several developments, but fenceline monitoring was not among them. EPA, Technology Review and NSPS Review for Lead Acid Battery Manufacturing (2022) ("Technology Review Memorandum") at 38, JA_____. EPA acknowledged fenceline monitoring requirements imposed by California regulators on similar sources that also have fugitive lead emissions. *See id.* at 22 (discussing requirements for "ambient monitoring"—i.e., fenceline monitoring—for lead imposed by a California regional air district), JA____. Nonetheless, EPA did not discuss the applicability of any of these advances in fenceline monitoring to lead acid battery makers. Nor did EPA provide an explanation of why it restricted its search for relevant developments to advances adopted within the lead acid battery making industry.

### 2. Petitioners' Comments pointed out developments in fenceline monitoring, including to control lead emissions.

Petitioners filed timely comments arguing that fenceline monitoring is a

relevant development and urging EPA to adopt a fenceline monitoring and

corrective action standard as a necessary development under Section 7412(d)(6).

Petitioners' Comments at 14-16, JA____-__. As evidence that fenceline monitoring

is a relevant development, Petitioners noted that EPA had identified fenceline

monitoring as a development for controlling fugitive emissions in the technology

review for the Petroleum Refineries categories. *Id.* at 15, JA____. Petitioners also

pointed to the growing use of fenceline monitoring and corrective action at

facilities with significant fugitive lead emissions—as shown by local rules

mandating such monitoring in California—as evidence that fenceline monitoring

could be used to control lead emissions. *Id.* at 14-15, JA____-__.

### 3.    In the Final Rule, EPA doubled down on its unlawful approach, concluding fenceline monitoring is not a development.

EPA declined to adopt a fenceline monitoring and corrective action standard.

Final Rule, 88 Fed. Reg. at 11,566, JA____. In the Final Rule, EPA included its

long-standing definition of development. *Id.* at 11,559, JA____. Yet, EPA stood by

its decision to search only for developments in the category, stating: "In the

technology review that was made available at proposal . . . we did not find that

fenceline monitoring in the lead acid battery manufacturing source category is a

new trend in facility procedures or is generally in use at these facilities." EPA,

17

Response to Comments at 19, JA____.

On that basis, EPA concluded fenceline monitoring was not a development. *Id.* Consequently, EPA never got to the second stage of its regulatory framework, and, thus, never analyzed the "technical feasibility, estimated costs, energy implications, [or] non-air environmental impacts" of a fenceline monitoring and corrective action standard. Final Rule, 88 Fed. Reg. at 11,559, JA____.

## SUMMARY OF ARGUMENT

Section 7412(d)(6) requires EPA to determine "whether standards should be tightened in view of developments in technologies and practices since the standard's promulgation or last revision." *Nat'l Ass'n for Surface Finishing*, 795 F.3d at 5. In light of the revolutionary advances in the use of fenceline monitoring to control air pollution since the 2007 Rule, fenceline monitoring is plainly a development in pollution control. Accordingly, EPA was required to take it into account in this rulemaking.

Avoiding that conclusion, EPA interpreted the Act as requiring a pre-requisite: in order to identify an advance in pollution control as a development, the pollution control must already be in use within the category being reviewed. Applying that interpretation here, EPA determined that fenceline monitoring was not a development in pollution control. Having concluded fenceline monitoring

18

was not a development, EPA necessarily did not take it into account in this rulemaking.

EPA's interpretation and resulting determination that fenceline monitoring is not a development are unlawful for three reasons.

1.    EPA's interpretation violates Congress' unambiguous command that EPA consider developments in pollution control, without limitation, when determining whether to revise standards. 42 U.S.C. § 7412(d)(6). In this specific context, "practices, processes, and control technologies" refer to types of pollution control that, by their nature, have the potential to be used across multiple industries, a meaning Congress assuredly understood.

Thus, if Congress had intended to limit EPA to analyzing developments "in the category" being reviewed, it would have used that phrase, just as it did in multiple other provisions of Section 7412. *E.g.* 42 U.S.C. § 7412(d)(3). Those other provisions confirm that when Congress wanted to prevent EPA from considering relevant pollution controls from another industry, it did so expressly by using the limiting phrase "in the category." *Id.* "The absence of such a reference [in Section 7412(d)(6)] must be given effect." *New York v. EPA*, 413 F.3d 3, 40 (D.C. Cir. 2005).

EPA's interpretation is also inconsistent with the "technology-based" nature

of Section 7412(d). *NRDC v. EPA*, 529 F.3d 1077, 1079 (D.C. Cir. 2008). Under this technology-based regime, EPA must search for pollution controls that "exist[]" or are "feasibl[e]"—i.e., those that <u>could</u> be applied in the category, not just those that are already in use. *NRDC v. Reilly*, 983 F.2d 259, 268 (D.C. Cir. 1993).

Because the Act is unambiguous, EPA cannot require that a pollution control be used in the category as a pre-requisite to identifying that pollution control as a development. EPA's attempt to do so here is an impermissible and unlawful "administrative narrowing of [a] clear statutory mandate[]." *New York*, 413 F.3d at 41 (cleaned up).

2.      Even if the statute were ambiguous, EPA is not entitled to deference for three reasons. First, EPA's interpretation would slow the pace of pollution control and is therefore inconsistent with the Act's purpose of preventing pollution. *E.g.,* 42 U.S.C. § 7401(c); *see Ohio v. U.S. Dep't of the Interior*, 880 F.2d 432, 454 (D.C. Cir. 1989) (rejecting agency interpretation that is inconsistent with the statute's purpose). Second, because EPA offered no explanation for its interpretation, no deference is warranted. *BP Energy Co. v. FERC*, 828 F.3d 959, 965 (D.C. Cir. 2016).

Third, EPA's new interpretation is unreasonable because it conflicts with its

long-standing definition of developments—which remains "on the books"—and EPA failed to acknowledge, let alone explain, that discrepancy. *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). In this rulemaking, EPA committed to applying its long-standing definition of developments, which includes "any work practice[]" or "any . . . equipment" that was "not <u>identified or considered</u>" in the prior rulemaking. *E.g.,* Final Rule, 88 Fed. Reg. at 11,559 (emphasis added), JA____. EPA's new interpretation significantly differs from that definition. Because EPA failed to acknowledge, let alone rationally explain, this major break from its existing regulatory framework and past precedents, it is not entitled to deference. *Encino Motorcars v. Navarro*, 579 U.S. 211, 222 (2016).

3.    Finally, EPA's action is arbitrary and capricious. In this rulemaking, EPA committed to using its long-standing regulatory framework for identifying and analyzing developments—including its long-standing definition of developments. Despite that commitment, EPA did not do so. That unexplained failure to comply with its own regulatory framework and past precedents is arbitrary. *See Kentucky Mun. Energy Agency v. FERC*, 45 F.4th 162, 177 (D.C. Cir. 2022).

## STANDARD OF REVIEW

In reviewing a Clean Air Act rule promulgated under Section 7412(d), the Court reverses any action that is "arbitrary, capricious, an abuse of discretion, or

otherwise not in accordance with law." 42 U.S.C. § 7607(d)(9)(A); *id.*

§ 7607(d)(1)(B). This is the same as the arbitrary and capricious standard under the

Administrative Procedure Act. *Bluewater Network v. EPA*, 370 F.3d 1, 11 (D.C. Cir.

2004).

　　This Court reviews "EPA's interpretation of the [Clean Air Act] . . .under

*Chevron*'s familiar two-step." *New York*, 413 F.3d at 18. First, the Court

"examine[s] the statute *de novo*, employing traditional tools of statutory

construction." *Nat'l Ass'n of Clean Air Agencies v. EPA*, 489 F.3d 1221, 1228

(D.C. Cir. 2007) (cleaned up). If Congress has directly spoken to the question at

issue, that is the end of the matter: "EPA must obey." *New York*, 413 F.3d at 18.

　　If the Court finds that the statute is "silent or ambiguous with respect to the

specific issue," it defers to an agency's interpretation at *Chevron* Step Two only if

it is based on a "permissible" or "reasonable" construction of the statute. *Chevron,*

*U.S.A., Inc. v. NRDC*, 467 U.S. 837, 843-44 (1984). An agency's interpretation is

unreasonable where: it is not "consistent with the statutory purpose and legislative

history," *NRDC v. Daley*, 209 F.3d 747, 752 (D.C. Cir. 2000) (cleaned up); makes

"no reasonable attempt to grapple with or even refer back to the statutory text," *BP*

*Energy Co.*, 828 F.3d at 965 (cleaned up); or does not even "display awareness that

it is changing position," *Encino*, 579 U.S. at 222 (cleaned up). Similarly, an

unreasonable interpretation receives no deference *Skidmore* deference. *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 360-61 (2013) (citing *Skidmore v. Swift & Co.*, 323 U.S. 134 (1944)).

Agency action is arbitrary and capricious if the agency "relies upon improper factors, ignores important arguments or evidence, [or] fails to articulate a reasoned basis" for its action. *NRDC v. EPA*, 822 F.2d 104, 111 (D.C. Cir. 1987).

## STANDING

Petitioners have standing on behalf of themselves and their members, as they are injured by the Rule in at least three ways.

1.      Petitioners are environmental groups with members living near lead acid battery manufacturers in Kansas, Indiana, California, and other states throughout the country. As detailed in the attached declarations, members live, work, recreate, and breathe air near lead acid battery makers, and, as a result, are exposed to lead emitted by these facilities. Lead emissions from these facilities harm members' health, wellbeing, and aesthetic and recreational interests. *E.g.*, Norlin Decl., DEC0018, McMartin Decl., DEC0010, Aguirre Decl., DEC0036.

A fenceline monitoring and corrective action standard would reduce lead emissions from these facilities and reduce Petitioners' exposure. Because there "is no safe level of exposure to lead . . . any action to reduce exposures can have

impacts on lives and livelihoods." EPA, Basic Information about Lead in Drinking Water, JA____. Accordingly, EPA's failure to adopt such a standard subjects Petitioners' members to "more [pollution]," and thereby injures those members. *Clean Wisconsin v. EPA*, 964 F.3d 1145, 1158 (D.C. Cir. 2020); *see NRDC v. EPA*, 643 F.3d 311, 318 (D.C. Cir. 2011) (finding injury from a rule that prolongs ongoing exposures to pollution).

2.    EPA's failure to lawfully consider in this rulemaking whether to require a fenceline monitoring and corrective action standard injures both Petitioners and their members by depriving them of information that EPA was obligated to disclose to them. *Friends of Animals v. Jewell*, 824 F.3d 1033, 1040 (D.C. Cir. 2016) ("[A] plaintiff suffers an injury in fact when the plaintiff fails to obtain information which must be publicly disclosed pursuant to a statute." (cleaned up)); *EDF v. EPA*, 922 F.3d 446, 452-53 (D.C. Cir. 2019) (similar). EPA was legally obligated to analyze the methods, effectiveness, and technical feasibility of fenceline monitoring, *see* 88 Fed. Reg. at 11,559 (describing EPA's framework for conducting the technology review), and then make that analysis available to the public as part of the public docket for this rulemaking, 42 U.S.C. § 7607(d)(3). Such information would have been helpful to Petitioners and members in their advocacy to prevent communities from being harmed by toxic air

24

pollution. *E.g.,* Williams Decl. ¶¶ 14, 17, 19-20, DEC0041; Carman Decl. ¶¶ 17-19, 23-24, DEC0023.

3.      If EPA established a fenceline monitoring and corrective action standard, the resulting monitors would also provide Petitioners and their members with data about air pollution that they would use to protect their health. *E.g*., Williams Decl. ¶¶ 16-20, Carman Decl. ¶¶ 20-24; *see People for the Ethical Treatment of Animals v. U.S. Department of Agriculture,* 797 F.3d 1087, 1095 (D.C. Cir. 2015).

Remanding the Final Rule to EPA and ordering the Agency to comply with the Clean Air Act would redress these injuries. *See Sierra Club v. EPA*, 699 F.3d 530, 533 (D.C. Cir. 2012); *City of Waukesha v. EPA*, 320 F.3d 228, 234 (D.C. Cir. 2003).

**ARGUMENT**

I.    **EPA'S INTERPRETATION IS CONTRARY TO THE
      UNAMBIGUOUS MANDATE IN SECTION 7412(D)(6) THAT EPA
      TAKE INTO ACCOUNT ALL RELEVANT DEVELOPMENTS.**

EPA's interpretation that an advance in pollution control is not a
"development[] in practices, processes, and control technologies," unless the
pollution control is already used by sources within the industry, violates the
unambiguous meaning of Section 7412(d)(6). 42 U.S.C. § 7412(d)(6).

Congress mandated that EPA take into account all "developments in
practices, processes, and control technologies" without limitation. *Id.* In the
specific context of controlling air pollution, "practices, processes, and control
technologies" refer to forms of pollution control that, by their nature, have the
potential to be used across multiple industries, a meaning Congress assuredly
understood. Thus, an advance in pollution control in another industry is plainly a
development that EPA must take into account. *Id.*

Thus, Congress spoke "directly . . . to the precise question at issue,"
*Chevron*, 467 U.S. at 843, and EPA acted unlawfully by only identifying
"developments in practices, processes, or control technologies by lead acid battery
manufacturing sources." 87 Fed. Reg. at 10,134 (emphasis added), JA____. In
creating this pre-requisite to identifying a development in pollution control, EPA

unlawfully "exclude[s] from coverage certain items that clearly fall within the plain meaning of [the] statutory term." *U.S. Telecom Ass'n v. FCC*, 359 F.3d 554, 592 (D.C. Cir. 2004). EPA may not create such a pre-requisite, and thereby "administrative[ly] narrow[]" the scope of developments it must take into account. *New York*, 413 F.3d at 40 (cleaned up) (rejecting an agency interpretation that rewrote the plain scope of a statutory term).

1.    The plain meaning of the phrase "developments in practices, processes, or control technologies" encompasses advances or changes in pollution controls—including advances in other industries—since the last rulemaking for the category.[6] *See Nat'l Ass'n for Surface Finishing*, 795 F.3d at 5. In Section 7412(d)(6), Congress set out three types of relevant developments in pollution control that EPA must take into account. In doing so, Congress was "undoubtedly aware" that advances in pollution control in one industry could be used to control pollution in another and would therefore be relevant developments which EPA

---

[6] Around the time Section 7412(d)(6) was enacted "developments" referred to "advances" or "a new event or change that makes something different or better." *Chemehuevi Tribe of Indians v. Fed. Power Comm'n*, 489 F.2d 1207, 1229 (D.C. Cir. 1973) (describing "developments in [] technology" as "technological advances"), *vacated and remanded on other grounds*, 420 U.S. 395 (1975); Development, Longman Basic Dictionary of American English 74 (Adam Gadsby et al. ed., 1st ed. 1999), JA____; *see Perrin v. United States*, 444 U.S. 37, 42 (1979) (where a statute does not define a term, it carries its "ordinary, contemporary, common meaning.").

should analyze. *United States v. Braxtonbrown-Smith*, 278 F.3d 1348, 1353 (D.C. Cir. 2002).

In the specific context of controlling air pollution, the terms "practices, processes, and control technologies" are not industry-specific. *See All. of Artists & Recording Companies, Inc. v. DENSO Int'l Am., Inc.*, 947 F.3d 849, 866 (D.C. Cir. 2020) (holding that statutory interpretation must be "context-sensitive," particularly in a technical area like computer technology). *Braxtonbrown-Smith*, 278 F.3d 1348, 1353-54 (D.C. Cir. 2002) (considering the inherent "nature of money" in interpreting a money-laundering statute). Instead, "practices, processes, and control technologies" are forms of pollution control that, by their nature, have the potential to be used across multiple industries, a meaning Congress assuredly understood.

Use of the same pollution control across different industries is common because facilities in different industries engage in similar activities—such as burning fossil fuels, melting metals, or reacting organic chemicals—using similar equipment, which then emit similar hazardous air pollutants. For example:

- Wet scrubbers are a technology used to clean industrial gases and are used in a number of industries, including: Petroleum Refineries; Hazardous Waste Combustors; and Refractory Products

28

Manufacturing.[7]

- Fabric filters are a technology that removes particles from a contaminated gas stream and are used in a number of industries, including: Lead Acid Battery Manufacturing Area Sources; Secondary Lead Smelters; and Brick and Structural Clay Manufacturers.[8]

- Opacity limits are a work practice that limits visible emissions and are used in a number of industries, including: Coke Ovens; Integrated Iron and Steel Manufacturing; and Primary Copper Smelters.[9]

Thus, in the specific context of pollution control, the term "developments in practices, process, and control technologies" plainly encompasses all advances in pollution control, including advances from other industries. 42 U.S.C. § 7412(d)(6). Given that plain meaning, Congress would certainly have used limiting language if it intended to establish a pre-requisite, under which a pollution control must already be used in the industry, in order to be identified as a development.

2.    Instead, Congress "intentionally and purposely" did not limit EPA to

---

[7] 40 C.F.R. Pt. 63, Subpt. UUU, Tbl. 4; *id.* § 63.1209; *id.* Pt. 63, Subpt. SSSSS, Tbl. 8. *See also* Industrial, Commercial, and Institutional Boilers, *id.* § 63.11211; Taconite Iron Ore Processers, *id.* § 63.9622
[8] *See* 40 C.F.R. § 63.11423; *id.* § 63.548; § 63.8450.
[9] *See* 40 C.F.R. § 63.7324; *id.* § 63.7821; *id.* § 63.1444.

considering developments "in the category," omitting that precise phrase from Section 7412(d)(6) while including it in other provisions of Section 7412, *e.g.*, 42 U.S.C. § 7412(d)(3)(A), (B), 7412(i)(5)(D). *New York*, 413 F.3d at 39. "[W]hen Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *New York*, 413 F.3d at 39. Because Congress directed EPA to "tak[e] into account developments [in pollution control]," without any limitation, 42 U.S.C. § 7412(d)(6), that purposeful choice "must be given effect." *New York*, 413 F.3d at 39.

For example, in directing EPA to establish initial standards for major source categories, Congress used the phrase "in the category" to limit EPA from considering pollution controls from other industries at one step of standard setting, but omitted the phrase at another step because Congress wanted EPA to consider controls from other industries. Setting major source standards has two steps, in which EPA: (1) sets "floors" that establish "minimum stringency requirements" under Section 7412(d)(3); and then (2) determines whether stricter, "beyond-the-floor" standards are "achievable" under Section 7412(d)(2). *Nat'l Lime*, 233 F.3d at 629 (cleaned up).

In directing EPA to calculate the floors, Congress expressly limited EPA to

considering the emission rates achieved by the best performing sources "in the category." 42 U.S.C. § 7412(d)(3)(A), (B). In contrast, in determining whether to establish beyond-the-floor standards, Congress directed EPA to determine whether stricter standards were "achievable" "through application of measures, processes, methods, systems or techniques" without using that limiting phrase. *Id.* § 7412(d)(2). Accordingly, when setting beyond-the-floor standards for a category, EPA considers relevant pollution control measures, including those used in other industries outside the category. *E.g.*, Revised Standards for Hazardous Waste Combustors, 61 Fed. Reg. at 17,368, JA____. Thus, EPA has stated that its beyond-the floor analysis "involves consideration of . . . technologies currently in use within [the category], and also other more efficient and appropriate technologies that have been demonstrated and are available on the market." *Id.*

Congress knew how to confine EPA's analysis to the category when it so wished.[10] The absence of any such limiting language in Section 7412(d)(6) further

---

[10] Similarly, Congress used the limiting phrase "in the category" in other provisions of Section 7412 when it wanted to limit the scope of the provision. *E.g.*, 42 U.S.C § 7412(i)(5)(D) (requiring EPA to conduct a health risk review considering emissions from sources that have been granted an alternative emission limit "at the same time that other sources in the category or subcategory are reviewed") (emphasis added); *see, also, id.* § 7412(j)(2) (if EPA fails to timely promulgate a standard for a category, then the "owner or operator of any major source in such category…shall submit a permit application") (emphasis added).

confirms Congress intended that EPA take into account all developments in

pollution control, including advances from other industries. That Congressional

choice "must be given effect." *New York*, 413 F.3d at 40.

3.      Finally, the plain meaning of Section 7412(d)(6) is reinforced by the

fact that this is a "technology-based" provision. *See NRDC v. EPA*, 529 F.3d at

1079 (holding that Section 7412(d) requires EPA to adopt "technology-based

standards"); 1990 U.S.C.C.A.N. 3385, 3518 ("technology-based standards will

become the principal focus of activity under section [7412]"), JA____. As this

Court has recognized, "[t]echnology-based provisions require EPA to promulgate

standards only after finding that the requisite technology exists or may be feasibly

developed." *NRDC v. Reilly*, 983 F.2d at 268. In other words, in setting

technology-based standards under Section 7412(d), EPA must consider pollution

controls that could feasibly be used in an industry, not just those already in use.

Thus, when setting initial standards for a category under Section 7412(d),

Congress directed EPA to consider relevant pollution controls from other industries

that could be applied to the category. 42 U.S.C. § 7412(d)(2), (d)(5); Wool

Fiberglass Rule, 78 Fed. Reg. at 22,376 (looking to "similar" industries to set

initial area source standards), JA____; Revised Standards for Hazardous Waste

Combustors, 61 Fed. Reg. at 17,368 (looking to other industries for "appropriate

technologies" in setting initial major source standards)), JA____. Similarly, when EPA conducts a subsequent technology review for the category, Congress mandated that EPA would <u>once again</u> look outside the category to see whether there have been relevant developments in pollution control in other industries. 42 U.S.C. § 7412(d)(6).

Such an approach is required by the technology-based nature of Section 7412(d). Requiring that a pollution control already be in use within the category— as a pre-requisite to EPA mandating its use across the category—would slow the progress of pollution control and undermine this technology-based mandate.

4.    Thus, the traditional tools of statutory construction establish that Congress unambiguously mandated that EPA take into account all relevant developments in pollution control since the last rulemaking for the category, including developments from other industries. 42 U.S.C. § 7412(d)(6).

Therefore, EPA acted unlawfully when it EPA established a pre-requisite for identifying a development: that the pollution control already be in use within the category under review. EPA's establishment of this pre-requisite unlawfully narrows the scope of the term "developments in practices, process, and control technologies." *New York*, 413 F.3d at 41 ("[T]his court has consistently struck down administrative narrowing of clear statutory mandates." (cleaned up)); 42

33

U.S.C. § 7412(d)(6). Because EPA may not "exclude from coverage certain items that clearly fall within the plain meaning of a statutory term," its interpretation is unlawful. *U.S. Telecom Ass'n*, 359 F.3d at 592.[11]

## II.    EVEN IF SECTION 7412(D)(6) WERE AMBIGUOUS, EPA'S INTERPRETATION IS UNREASONABLE BECAUSE IT IS UNEXPLAINED.

Even if the Court were to conclude that Section 7412(d)(6) is ambiguous, EPA is not entitled to any deference, whether under *Chevron, Skidmore,* or any other deference canon. In this rulemaking, EPA created a prerequisite to identifying an advance in pollution control as a development—that the pollution control be in use within the category under review. *See* Response to Comments at 19, JA____; Proposed Rule, 87 Fed. Reg. at 10,134, JA____. That interpretation receives no deference for three reasons.

1.    EPA's interpretation is impermissible because it is inconsistent with Section 7412's purpose, for the reasons given in Section I, *supra. See NRDC v. Daley*, 209 F.3d at 752 (requiring agency interpretation to be "consistent with the statutory purpose" (cleaned up)); *Ohio*, 880 F.2d at 454 (similar). Congress enacted a technology-based approach in Section 7412(d), which requires EPA to consider

---

[11] Accordingly, EPA's determination "runs afoul of [Section 7412(d)(6)]" and therefore is arbitrary. *Ctr. For Biological Diversity v. Dep't of Interior*, 563 F.3d 466, 488 (D.C. Cir. 2009).

whether an advance in pollution control could feasibly be applied in a category. By now requiring that a pollution control already be in use in a category—as a prerequisite to considering it in a technology review—EPA's new interpretation slows the adoption of pollution controls that reduce emissions of highly toxic chemicals. Therefore, it is contrary to the Act's primary purposes of reducing pollution and protecting health. *See* 42 U.S.C. § 7401(c) (a "primary goal" of the Act is "pollution prevention."); *id.* § 7401(b)(1) (a purpose of the Act is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population").

2.      EPA provided no explanation, let alone a reasoned one, for its interpretation. *Miller v. Clinton*, 687 F.3d 1332, 1342 (D.C. Cir. 2012) (no deference for an "unexplained" interpretation).

In the Proposed Rule, EPA stated that it would "determine whether there have been developments in practices, processes, or control technologies by lead acid battery manufacturing sources," without explaining why it would not look for developments outside the category. 87 Fed. Reg. at 10,139, JA____. Then, in response to Petitioners' Comments identifying developments in fenceline monitoring to control lead, EPA stated that fenceline monitoring was not a development because it "did not find that fenceline monitoring in the lead acid

35

battery manufacturing source category is a new trend in facility procedures or is generally in use at these facilities." EPA Response to Comments at 19, JA____.

In those statements, EPA "ma[de] no reasonable attempt to grapple with or even refer back to the statutory text." *BP Energy*, 828 F.3d at 965-66 (cleaned up). Thus, EPA simply announced its new interpretation of what developments it will identify, without providing <u>any</u> explanation of why that approach was lawful, rendering its determination unreasonable. *Id.* (no *Chevron* deference); *Univ. of Tex. Sw. Med. Ctr.*, 570 U.S. at 361 (no *Skidmore* deference).

3.       Finally, the Agency "simply disregard[ed]" its existing regulatory definition of developments and departed from that definition "*sub silentio.*" *Fox*, 556 U.S. at 515 (an agency cannot ignore a rule that is "on the books"); s*ee Encino*, 579 U.S. at 221 (similar).

In this rulemaking, EPA committed to use its long-standing, five-part definition of "developments." Proposed Rule, 87 Fed. Reg. at 10,140, JA____; Final Rule, 88 Fed. Reg. at 11,559, JA____. Under that definition, a development is any work practice or equipment that was not "identified or considered" the last time EPA conducted a rulemaking for the category. Final Rule, 88 Fed. Reg. at 11,559, JA____. Thus, when EPA identified fenceline monitoring as a development in the 2015 Petroleum Refinery Rule, EPA's determination was based on the fact

that fenceline monitoring was both a "work practice" and type of "equipment" that had not been considered in the prior rulemaking.[12] Petroleum Refinery Rule, 80 Fed. Reg. at 75,193, JA____. Whether fenceline monitoring had already been adopted by petroleum refineries was not a relevant factor EPA considered using its definition of "developments." *Id.*[13]

Yet, EPA's new interpretation takes a different tack: requiring that a pollution control must already be in use within the category under review as a prerequisite to identifying it as a development. EPA's failure to acknowledge, let alone explain, that shift or the contradiction between these two positions is arbitrary and therefore not entitled to deference. *Encino*, 579 U.S. at 221.

---

[12] In response to commenters' argument that fenceline monitoring was not a development, EPA stated: "fenceline monitoring is a type of equipment that we did not identify and consider during development of the original MACT standards. Additionally, the fenceline standard is a work practice standard . . . not identified at the time of the original MACT standards. Therefore, the fenceline requirements are a development." Petroleum Refinery Rule, 80 Fed. Reg. at 75,193, JA_____.

[13] Indeed, EPA routinely considers advances that have been adopted in other industries when attempting to identify relevant developments. *E.g.*, Shipbuilding Rule, 75 Fed. Reg. at 80,234 (considering if developments from other source categories "could possibly be applied to emission sources in the source categories under this current [technology] review"), JA____.

III.   **EPA'S ACTION IS ARBITRARY AND CAPRICIOUS BECAUSE IT IS CONTRARY TO EPA'S EXISTING REGULATORY FRAMEWORK FOR IDENTIFYING AND ANALYZING DEVELOPMENTS.**

Regardless, EPA's determination not to revise standards to include a fenceline monitoring and corrective action standard is arbitrary and capricious. *See Humane Soc'y of United States v. Zinke*, 865 F.3d 585, 600 (D.C. Cir. 2017) (holding an agency action arbitrary even though the underlying interpretation was reasonable at *Chevron* Step 2).

EPA expressly committed to applying its long-standing regulatory framework for identifying and evaluating developments, but then failed to rationally apply that framework. *Kentucky*, 45 F.4th at 177-78 (agency action is arbitrary where it fails to follow its own regulations and precedents). EPA's proffered justifications for its decision not to adopt a fenceline monitoring and corrective action standard do not rationally explain its departure from that regulatory framework and are therefore arbitrary. *Id.* In addition, these justifications fail on their own terms because they are illogical and unsupported.

A.    **EPA did not rationally apply its existing regulatory framework for identifying and analyzing relevant developments.**

In this rulemaking, EPA committed to following its two-step regulatory framework for conducting a technology review but arbitrarily departed from that

framework. *See Kentucky*, 45 F.4th at 177-78.

EPA stated it would begin by "identif[ying]" any developments in pollution control since the standards were last promulgated, using its traditional definition of developments. Final Rule, 88 Fed. Reg. at 11,559, JA____; Proposed Rule, 87 Fed. Reg. at 10,140, JA____. Next, EPA committed that if it identified such developments, it would analyze the "emission reductions associated with applying each [identified] development," along with "technical feasibility, estimated costs, energy implications, and non-air environmental impacts," which would "inform[] [EPA's] decision of whether it is 'necessary' to revise the emissions standards." Final Rule, 88 Fed. Reg. at 11,559, JA____; Proposed Rule, 87 Fed. Reg. at 10,140, JA____. This two-step regulatory framework for conducting the technology review has been in place for at least a decade and because EPA recommitted to its use here, it remains "on the books." *Fox*, 556 U.S. at 515.

EPA acted arbitrarily at both steps when applying this framework. At the first step, EPA did not rationally apply its definition of developments to the record evidence. As for the second step, EPA skipped analyzing the necessity of fenceline monitoring altogether.

### 1.    EPA's refusal to "identify" fenceline monitoring as a development is contrary to its existing regulatory framework and the record.

EPA's conclusion that fenceline monitoring is not a development is arbitrary because the Agency ignored record evidence demonstrating that fenceline monitoring meets EPA's own definition of "developments," which EPA committed to using in this rulemaking. *See Kentucky*, 45 F.4th at 177-78. Consequently, EPA reached a conclusion that is "contrary to the record evidence." *Growth Energy v. EPA*, 5 F.4th 1, 32 (D.C. Cir. 2021).

The uncontroverted record evidence demonstrates that fenceline monitoring meets EPA's longstanding definition of developments. Final Rule, 88 Fed. Reg. at 11,559, JA____. Under that definition, a development is "any . . . equipment" or "any work practice" that was not "identified or considered during development of the original [2007] GACT standards" for the category. *Id.*

Fenceline monitors plainly are a type of "equipment" and fenceline monitoring is plainly a "work practice." Petroleum Refinery Rule, 80 Fed. Reg. at 75,193 (describing fenceline monitoring as both a "work practice" and a type of "other equipment" and therefore identifying it as a relevant development), JA____. And it is unquestionable that EPA did not identify or consider fenceline monitoring in the 2007 rulemaking for Lead Acid Battery Manufacturing Area Sources. *See*

40

2007 Rule, 72 Fed. Reg. 38,864, JA____.[14] Accordingly, the record evidence

demonstrates fenceline monitoring meets EPA's own definition of developments;

therefore, EPA's determination that fenceline monitoring is not a development is

"contrary to the record evidence." *Growth Energy*, 5 F.4th at 32.

Yet, nowhere in the record—not in the Technology Review Memorandum,

Proposed Rule, Final Rule, or its Response to Comments—did EPA apply its

regulatory definition to the record evidence. "By refusing to consider" evidence

demonstrating its own regulatory definition was met, EPA ignored an important

factor and acted arbitrarily. *Kentucky*, 45 F.4th at 178.

> ### 2. EPA arbitrarily failed to follow its framework and "analyze" whether it was necessary to revise standards to require fenceline monitoring.

EPA's refusal to evaluate the necessity of fenceline monitoring also renders

its decision arbitrary. *Kentucky*, 45 F.4th at 177-78. Under the second step of its

framework, EPA committed to analyzing the "technical feasibility, estimated costs,

---

[14] Indeed, even if EPA had identified or considered fenceline monitoring in the 2007 rulemaking, fenceline monitoring would still be a cognizable development because it meets EPA's definition of "developments" in two additional ways, as there have been both (1) "improvements" in and (2) "significant reduction in costs" of fenceline monitoring since the 2007 Rule. 88 Fed. Reg. at 11,159, JA____; *see* Cynthia Giles, *Next Generation Compliance* 24 (monitoring technology is "becoming more accurate, more mobile, and cheaper, all of which are contributing to a revolution in how we find and fix pollution problems"), JA____.

energy implications, and non-air environmental impacts" and "emissions reductions" of any identified development. Final Rule, 88 Fed. Reg. at 11,559 (stating this analysis "informs" EPA's necessity determination), JA____. EPA's failure to conduct this analysis is arbitrary.

1.    Here, EPA arbitrarily refused to identify fenceline monitoring as a development, and therefore skipped the second step of its regulatory framework. Thus, there is no place in the record where EPA analyzed the relevant factors—e.g., technical feasibility or estimated costs. Given that fenceline monitoring is a development, EPA's refusal to look at this relevant factor renders its action arbitrary. *Kentucky*, 45 F.4th at 177 (agency's refusal to look at a relevant factor, as required by its regulations and past practices, is arbitrary).

2.    EPA's claim that it lacked evidence that "employing fenceline monitoring . . . would reduce emissions beyond what the rule [already] require[s]" cannot justify this departure. Response to Comments at 19, JA____.

First, any "lack of knowledge is willful." *Pub. Citizen v. Fed. Motor Carrier Safety Admin.*, 374 F.3d 1209, 1222 (D.C. Cir. 2004) (holding agency action arbitrary where "the agency has not attempted to estimate the benefits" of potential regulation). EPA arbitrarily refused to identify fenceline monitoring as a development and thus wholly failed to "consider the emission reductions

42

associated with applying" fenceline monitoring as required under its regulatory framework. Final Rule, 88 Fed. Reg. at 11,559, JA____.

Second, that statement is contrary to EPA's prior precedent, in which EPA has recognized that fenceline monitoring can be beneficial even where EPA expects it will not reduce emissions beyond what the other standards will accomplish. *Kentucky*, 45 F.4th at 178 (agency acted arbitrarily where its rationale contradicted prior decision). For example, when EPA previously adopted a fenceline monitoring standard for the Petroleum Refineries categories, it did so with the express expectation that a fenceline monitoring and corrective action standard would not reduce emissions below what compliance with the other standards for the categories would achieve. *See* Petroleum Refinery Rule, 80 Fed. Reg. at 75,197 (stating EPA picked a corrective action level that "no refinery should exceed when in full compliance with the MACT Standards"), JA____; *id.* at 75,190 ("The action level we proposed was consistent with the emissions projected from fugitive sources compliant with the provisions of the refinery MACT standards."), JA____. Indeed, EPA has recognized that fenceline monitoring can be used to "call attention to" potential violations of other standards before they occur, enabling facility operators to proactively fix problems and avoid violating other standards. Next Generation Compliance Compendium at 12, JA____.

43

EPA offered no reason to believe that would not be the case here. EPA's action is contrary to its own precedents and regulatory framework and is, therefore, arbitrary and capricious. *Kentucky*, 45 F.4th at 177-78.

## B. EPA's justifications for departing from its regulatory framework fail.

EPA offered a series of justifications for its refusal to adopt a fenceline monitoring and corrective action standard, all of which fail. None "display awareness" that EPA departed from its regulatory framework. *Kentucky*, 45 F.4th at 179 (cleaned up). And they all fail on their own terms.

### 1. EPA offered irrational and unsupported justifications for why it did not "identify" fenceline monitoring as a development in pollution control.

EPA sought to justify its refusal to "identify" fenceline monitoring as a development in pollution control. The entirety of EPA's justification is as follows:

> In the technology review that was made available at proposal, we reviewed information from the EPA's RACT/BACT/LAER Clearinghouse, facility operating permits, and other regulatory development efforts. From this review, we did not find that fenceline monitoring in the lead acid battery manufacturing source category is a new trend in facility procedures or is generally in use at these facilities. Furthermore, requiring fenceline monitoring (along with all the other requirements in these LAB rules) would likely lead to significant economic impacts for some small businesses. <u>Therefore, it was not identified as a development</u>. . . .

Response to Comments at 19 (emphasis added), JA____.

Both justifications represent unacknowledged and irrational departures

from the regulatory framework EPA recommitted to using in this rulemaking. And

EPA's statements regarding costs to small businesses are also sheer speculation.

> **a.    EPA's refusal to identify fenceline monitoring as a development, based on the lack of adoption in the category, was unexplained and illogical.**

EPA's justification—that fenceline monitoring is not a development because

it is not a "new trend in [lead acid battery] facility procedures" or "generally in

use"—is arbitrary and capricious for two reasons.

1.    This justification does not acknowledge, let alone rationally explain,

why EPA declined to apply its long-standing definition of developments, as it

committed to do. *Kentucky*, 45 F.4th at 177-78; *Rapoport v. SEC*, 682 F.3d 98, 106

(D.C. Cir. 2012) (holding that the Commission's decision was arbitrary and

capricious because it departed from precedent without explanation).

In this rulemaking, EPA purported to use two different tests for identifying

developments that result in opposing outcomes. Under its long-standing

interpretation, fenceline monitoring is plainly a development because it is a work

practice or equipment that was not considered in the 2007 Rule. Under EPA's new

interpretation, fenceline monitoring is not a development.

EPA's failure to acknowledge, let alone explain, those irreconcilable

outcomes is irrational and arbitrary, even if the Court were to determine that EPA's

new interpretation is reasonable at *Chevron* Step 2. *Kentucky*, 45 F. 4th at 179;

*Humane Soc'y*, 865 F.3d at 605 (holding an agency action arbitrary even though

the underlying interpretation was reasonable at *Chevron* Step 2).

2.       EPA's explanation is also irrational in light of the record evidence

regarding the use of fenceline monitoring to control hazardous air pollutants,

particularly fugitive lead. *Kentucky*, 45 F.4th at 179 ("just because an agency need

not consider a relevant factor in every proceeding, does not mean the agency can

ignore that factor when it is raised and is significant").

The record established that, in California, several similar industries are

currently required to use fenceline monitors to control fugitive lead emissions.

These other industries engage in similar processes as lead acid battery makers—for

example, melting lead. *Compare* Technology Review Memorandum at 21, JA____,

*with* Final Rule, 88 Fed. Reg. at 11,560, JA____. Consequently, they have similar

problems with fugitive lead emissions, including producing fugitive lead dust.

*Compare* Technology Review Memorandum at 20-21, JA____-__, *with id.* at 26-

27, JA____-__. As a result, these industries already use many of the same (or

highly similar) pollution control technologies and practices as lead acid battery

makers, including: performance testing, fugitive dust minimization plans, and

fabric filters. *Compare* Technology Review Memorandum at 20-21, JA____-__,

*with id.* at 24-28, JA____-__. Indeed, EPA reviewed developments in pollution controls in these other industries—except for fenceline monitoring—in order to evaluate the efficacy of applying pollution controls at lead acid battery makers. Technology Review Memorandum at 28-29 (looking at controls at lead smelters), JA____-__.

Given the similarities between these industries, it was irrational for EPA to dismiss fenceline monitoring simply because it was not already in use by lead acid battery makers. This "ostrich-like approach" is arbitrary. *Kentucky*, 45 F.4th at 177.

> **b.    EPA's consideration of costs to small businesses was contrary to its regulatory framework and wholly speculative.**

EPA's second explanation for why it did not identify fenceline monitoring as a development—that it "would likely lead to significant economic impacts for some small businesses"—is arbitrary for two reasons. Response to Comments at 19, JA____.

1.    EPA improperly considered cost when determining whether fenceline monitoring is a development, which violates its two-step regulatory framework. *Kentucky*, 45 F.4th at 177-78; *Rapoport*, 682 F.3d at 106 (holding an agency's decision was arbitrary and capricious because it departed from precedent with no explanation). Under that framework, the Agency takes cost into account only <u>after</u>

it has identified relevant developments, when deciding whether it is "necessary" to revise standards. Final Rule, 88 Fed. Reg. 11,559, JA____. Here, EPA arbitrarily departed from this framework, using purported cost concerns at the first step to justify its refusal to identify fenceline monitoring as a development, without acknowledging or explaining the departure.

2.    Regardless, EPA's statements about costs to small businesses are entirely speculative: "nothing in the record indicat[es] that the Agency evaluated . . . cost[s]." *Bluewater Network*, 370 F.3d at 21. For example, EPA conducted an "Economic Impact and Small Business Analysis," but the analysis did not estimate the impact of a fenceline monitoring standard on small businesses. *See* EPA, Economic Impact and Small Business Analysis for the Lead Acid Battery Manufacturing NSPS Review and NESHAP Area Source Technology Review, JA____. Indeed, the words "fenceline monitoring" do not appear in the analysis at all. *Id.* Similarly, EPA's Technology Review Memorandum estimates the cost of developments the Agency did identify, such as periodic performance testing, but it contains no such estimate for fenceline monitoring. Technology Review Memorandum at 25, JA____.

Thus, EPA's reliance on the purported costs to small businesses was "sheer speculation," rendering EPA's decision arbitrary. *Sorenson Commc'ns Inc. v.*

48

*FCC*, 755 F.3d 702, 708 (D.C. Cir. 2014) (cleaned up).

### 2.    EPA's response to Petitioners' Comments was irrational.

EPA irrationally dismissed evidence that fenceline monitoring is being used by facilities with fugitive lead emissions. *See Humane Soc'y*, 865 F.3d at 601 (agency acts arbitrarily when it conducts its review "with blinders on" and ignores a relevant factor). In dismissing evidence that fenceline monitoring is being used to control fugitives lead emissions by companies in California, EPA stated that the specific terms of those rules—(1) the ambient lead level at which facilities would have to take corrective action and (2) the eligibility criteria that would subject facilities to the fenceline monitoring standard—"are not likely apply to lead acid battery [makers]." Response to Comments at 19, JA____.[15] That response is illogical.

First, it presumes that Petitioners' Comments were advocating that EPA adopt the California air district's standards verbatim. *See* Petitioners' Comments at 14-16, JA_____-__. Petitioners never advocated that EPA adopt those local fenceline monitoring regulations; instead, Petitioners pointed to the local rules as one piece of evidence demonstrating that fenceline monitoring is a development

---

[15] This statement did not form part of EPA's rationale for concluding that fenceline monitoring is not a development. Response to Comments at 19, JA____.

that could be used to control lead pollution. *See id.*

Second, this response is illogical in the context of analyzing the efficacy of fenceline monitoring, where the terms of any given standard—e.g., the pollutants to be monitored, the number of monitors required, and the corrective action level—are up to EPA to set. *See* Petroleum Refinery Rule, 80 Fed. Reg. at 75,254-56 (establishing action level of 9 μg/m$^3$ for benzene), JA____-__; NESHAP: Integrated Iron and Steel Manufacturing Facilities Technology Review, 88 Fed. Reg. 49,402, 49,415 (July 31, 2023) (proposing an action level of 0.1 μg/m$^3$ for chromium), JA____.

Thus, in stating that the terms of these local regulations were not likely to apply to lead acid battery makers, EPA ignored that it was the Agency's responsibility to decide whether to apply a fenceline monitoring and corrective action standard to the category and what the terms of the standard should be. Rather than apply its authority and experience to evaluating those factors, EPA simply declined to copy the local regulations and thus failed to rationally consider an important aspect of the problem. *See Humane Soc'y*, 865 F.3d at 601.

## CONCLUSION

For the foregoing reasons, this Court should vacate EPA's determination that fenceline monitoring is not a development, reverse EPA's action as unlawful, and

50

remand the Rule for EPA to correct its errors.

DATED:      August 31, 2023          Respectfully submitted,

*/s/ Tosh Sagar*
Tosh Sagar
Deena Tumeh
Earthjustice
1001 G Street, NW, Suite 1000
Washington, DC 20001
(202) 793-2075
(202) 793-6482
tsagar@earthjustice.org
dtumeh@earthjustice.org

*Counsel for Hoosier Environmental*
*Council, California Communities*
*Against Toxics, and Sierra Club*

51

**CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT**

Counsel hereby certifies, in accordance with Federal Rules of Appellate Procedure 32(a)(7)(B) that the foregoing **Proof Opening Brief of Hoosier Environmental Council, California Communities Against Toxics**, **and Sierra Club** contains 10,481 words, as counted by counsel's word processing system, and thus complies with the 13,000 word limit.

Further, this document complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5) & (a)(6) because this document has been prepared in a proportionally spaced typeface using **Microsoft Word 2016** using **size 14 Times New Roman** font.

DATED: August 31, 2023                    /s/ *Tosh Sagar*
                                           Tosh Sagar

## CERTIFICATE OF SERVICE

I hereby certify that on this 31st day of August, 2023, I have served the

foregoing **Proof Opening Brief of Hoosier Environmental Council, California**

**Communities Against Toxics, and Sierra Club**, including the Addendum

thereto, on all registered counsel through the court's electronic filing system

(ECF).

*/s/ Tosh Sagar*
Tosh Sagar
